**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **OXFORD BANK & TRUST and FIFTH AVENUE PROPERTY MANAGEMENT,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 10 C 04347** |
| **v.** | ) ) | **Judge John J. Tharp, Jr.** |
| **VILLAGE OF LA GRANGE, ELIZABETH M. ASPERGER, and ROBERT PILIPISZYN,** | ) ) ) ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The plaintiffs, Oxford Bank & Trust (as Trustee) and Fifth Avenue Property Management, are companies that own and manage a commercial property at 71 South LaGrange Road, in the downtown area of the Village of La Grange, Illinois. John and Larry Brannen, and other family members, own or manage these entities and the properties they own. The plaintiffs (or "landlords") sued the Village, the Village President, and the Village Manager, (together, the "Village defendants") after a change in the Village's zoning ordinance prevented their tenant from opening a pawn shop. The tenant, Andrew Grayson, is not a party to this action. The landlords' 23-count, 315-paragraph Amended Complaint alleges that the Village violated the plaintiffs' federal and state constitutional rights and committed various state-law torts, including conspiracy, thereby depriving them of a lucrative long-term lease with Grayson. The relief sought includes a declaratory judgment and damages, including punitive damages against the individually named Village officials.

Currently pending are the parties' cross-motions for summary judgment and cross-motions to strike. Each party's initial summary-judgment filing consists of a motion, the statement of uncontested material facts required by Local Rule 56.1(a)(1)(3), and a supporting memorandum. Each party's response consists of a brief as well as an answer to the moving party's factual statement and a separate statement of additional material facts pursuant to Rule 56.1(b)(3)(B) and (C). Finally, the parties each filed a reply brief and a further response to the other's statement of additional material facts. As if these were not enough, both parties also filed and fully briefed cross-motions to strike large portions of each other's Rule 56.1 statements and responses as argumentative, unsupported by the evidence, or otherwise improper.

The motions to strike are denied. This Court agrees with its colleagues that motions to strike are disfavored in summary judgment proceedings unless they expedite the Court's work. *E.g., Indep. Trust Corp. v. Fidelity Nat. Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1052 (N.D. Ill. 2008). Here the parties' motions to strike do nothing to clarify the factual record and amount to little more than additional, unauthorized pages of briefing in support of their respective summary-judgment motions—the rules for which already provide ample opportunity to respond to and rebut the other party's version of events. The Court is capable of disregarding statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, or contain unfounded, irrelevant, or unsupported assertions of fact. Thus, consistent with its obligations under the federal and local rules, the Court will rely only on material statements of fact which are both admissible and supported by the record. *See* Fed.R.Civ.P. 56(e); L.R. 56.1; *see also Davis v. Elec. Ins. Trs.*, 519 F. Supp. 2d 834, 836 (N.D. Ill. 2007); *Lawrence v. Bd. of Election Com'rs*, 524 F. Supp. 2d 1011, 1014 (N.D. Ill. 2007).

The core facts of this dispute can be stated briefly (additional facts, applicable to particular arguments, will be discussed in the context of those arguments). On May 20, 2009, the landlords executed a commercial lease with Andrew Grayson, who intended to open a pawn shop in the space and who, on May 22, 2009, received a business license from the Village of La Grange for that purpose. Shortly thereafter, opponents of the pawn shop, including Michael LaPidus, president of the La Grange Business Association, held an "urgent" community meeting and began lobbying the village government to prevent the store from opening. In the meantime, Grayson applied for building permits to renovate the property. But while those applications were pending, an ordinance was introduced that would make various changes to the zoning in the C-1 district, the area encompassing the Village's central business district, including making pawn shops a prohibited use. The proposed ordinance was taken up by the Village's Plan Commission at a special public meeting on June 29, 2009. The Plan Commission voted to recommend adoption of all of the proposed zoning changes. At its public meeting on July 13, 2009, the Village Board, which includes defendant Asperger, adopted the amending ordinance by unanimous vote. As a result of the amendments, Grayson effectively lost his business license, and the landlords lost the benefit of their lease, which required Grayson to use the space for "resale/pawn shop and its related services." The store never opened, nor was it remodeled. Neither the landlords nor the tenant requested zoning relief from the Village or challenged the zoning classification in state court. Instead, the landlords filed this action.

The landlords primarily allege violations of their federal and state constitutional rights to procedural and substantive due process and equal protection on a "class of one" theory (Counts One through Eighteen of the Amended Complaint). The remainder of the Amended Complaint alleges common-law claims of interference with vested rights, conspiracy, and tortious

interference with contractual rights.  For the reasons discussed below, the Court grants judgment for the defendants on all of the claims asserted.

## DISCUSSION

The individual defendants raise various immunity defenses (legislative, qualified, and statutory) and further contend, along with the Village, that as a matter of law the plaintiffs fail to establish any constitutional violations or torts arising from the zoning amendments. The defendants also argue, particularly with respect to the due process claims, that the landlords lack standing to enforce their tenant's property interest in the business license he received before the Village outlawed pawn shops in the zoning district. For their part, the plaintiffs argue that they have garnered sufficient evidence not only to withstand summary judgment, but to be entitled to judgment themselves on all 23 counts of their Amended Complaint.

Summary judgment will be granted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Davis*, 668 F.3d at 477.  When cross-motions for summary judgment are being resolved together, this same standard applies in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).  Further, if the non-moving party fails to establish an essential element of a claim on which it will bear the burden of proof at trial, summary judgment is appropriate against that party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Before addressing the merits, however, the Court first considers several threshold issues.

A. **Subject Matter Jurisdiction**

First, although the parties have not raised the issue, this Court is obligated consider its own jurisdiction *sua sponte*, and a red flag appears when a party primarily challenges the zoning of his property. Although exhaustion of remedies, in the typical sense, is not a prerequisite to a § 1983 suit, the term "exhaustion" is often used as shorthand for the ripeness rule of *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985). There, the Supreme Court held that a constitutional claim challenging a taking of property without just compensation cannot be ripe for adjudication in federal court until there has been (1) a conclusive determination whether plaintiff will be denied the proposed use of its property and (2) an action for compensation through the procedures the State has provided. *See id.* at 194-95; *Behavioral Institute of Indiana, LLC v. Hobart City of Common Council*, 406 F.3d 926, 930-31 (7th Cir. 2005). The first would entail seeking a zoning variance and appealing a denial; the second speaks to an action for just compensation for a regulatory taking. *B.I.I.*, 406 F.3d at 930. If inverse condemnation proceedings are shown to be unavailable or inadequate, that requirement is excused. *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 958 (7th Cir. 2004)

Although the landlords have not made a takings claim *per se*, the Seventh Circuit has been clear that *Williamson County*'s ripeness rule applies to all constitutional cases that at their core complain of government interference with the use of physical property. Thus, the rule applies with full force to due process claims (both procedural and substantive) and to equal protection claims when based on the same essential facts as a takings claim. *See Flying J., Inc. v. City of New Haven*, 549 F.3d 538, 543-44 (7th Cir. 2008); *Hager v. City of West Peoria*, 84 F.3d 865, 869 (7th Cir. 1996). In short, "[l]abels do not matter." *See River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994). Thus, the Seventh Circuit has instructed:

"Even in cases where a developer's proposed use is clearly at odds with local zoning ordinances, the developer must first seek a variance in the local zoning law and then pursue whatever state court remedies are available." *Flying J., Inc*, 549 F.3d at 543. The plaintiffs here have done none of these things.

But while the landlords allege that the profitable use of their property has been restricted by government regulation, the Court concludes that they do not allege a "taking" within the meaning of *Williamson County,* for at least two reasons. First, the facts of the case are sufficiently different than a true takings case to avoid application of the doctrine; "[i]n order to qualify as a regulatory taking, the measure must place such onerous restrictions on land as to render it useless." *Muscarello v. Ogle Cnty Bd. of Comm'rs*., 610 F.3d 416, 421 (7th Cir. 2010). Here—as in *Muscarello*—"the alleged economic effects are a far cry from the denial of all economically beneficial or productive use of the land" required to constitute a "taking." *See id.* The landlords did not lose the beneficial use of their property; they lost a single tenant. They remained able to lease to all sorts of commercial tenants, and indeed they eventually did, albeit about a year and a half later. *See* Pl. Mot., Doc. #81 at ¶ 14; Pl. Mem. of Law, Doc. # 84 at 4.

Even if the zoning change had worked more substantial restrictions on the property, the so-called "*bona fide* equal protection" exception to the *Williamson County* ripeness requirement would appear to provide jurisdiction over at least the equal protection and substantive due process claims. As the Seventh Circuit explained in *Flying J.*, "courts in this circuit have recognized an exception to the *Williamson County* ripeness requirement for '*bona fide* equal protection claims,'" 549 F.3d at 543, including those based, at least in part, on alleged "malicious conduct of a government agent, in other words, conduct that evidences a spiteful effort to 'get' [the plaintiff] for reasons unrelated to any legitimate state objective." *Id.* The landlords allege

6

precisely that, claiming that they were treated differently because the Village defendants "were motivated by animus and improper motive." Am. Compl. ¶¶ 78, 166. They elaborate on summary judgment that the Village defendants "were bitter and hostile" toward the plaintiffs in the wake of a failed real estate deal and that "Defendants' prior dealings with Plaintiffs spurned [sic] them and fostered a vengeful animus toward their property rental business that colored their decision to amend the zoning code." Pl. Mem. in Opp., Doc. # 80 at 3-4.

While the Court ultimately concludes that the plaintiffs' allegations of animus, ill-will, and spiteful conduct are substantively inadequate to save their equal protection claim, they suffice to vest this Court with jurisdiction over those claims. The same holds true as to the substantive due process claim, which alleges that the landlords were targeted out of spite and bad faith.[1] So, although this whole case boils down to the landlords' dissatisfaction with the effect of zoning regulations on their property, the Court concludes that all of the constitutional claims are sufficiently different from a true takings claim to avoid *Williamson County*'s ripeness requirement and to imbue this court with subject matter jurisdiction.

### B.     Legislative Immunity

Next, the Court must address the Village defendants' argument that absolute immunity insulates the individual defendants from suit because the zoning changes were accomplished through a duly enacted ordinance. *Tenney v. Brandhove*, 341 U.S. 367 (1951), held that state legislators are absolutely immune in any action for damages under § 1983[2] for their actions that are "legitimate legislative activity" and not done "for their private indulgence." *Id.* at 376-77.

---

[1] By contrast, the court has seen no example of the "*bona fide*" exception applying to a *procedural* due process claim, and the logic of the exception would not appear to apply, either. Unlike equal protection and substantive due process, procedural due process does not turn on government action alleged to be irrational, arbitrary, or vengeful. It is simply about whether appropriate procedures or compensation accompanied a deprivation of property.

[2] At the time, codified at 8 U.S.C. §§ 43, 47(3).

The Court further declared that "the claim of an unworthy purpose does not destroy the privilege." *Id.* at 377. The immunity also extends to local legislators. *See Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *Rateree v. Rockett*, 852 F.2d 946 (7th Cir. 1988). "[T]here is no material distinction between the need to insulate legislators at the national level to protect the public good, and the same need at the local level." *Rateree*, 852 F.2d at 950 (internal citation omitted).

Because legislative immunity is absolute, it is not just a defense to liability, but a protection against being sued at all. The Court therefore addresses it first because if the individual officials should not have been sued at all, there is no need parse the details of the claims against them (although the claims differ little from those against the Village itself— perhaps a sign that these defendants need not have been individually targeted).

The challenged zoning decision in this case was accomplished by the Village Board's adoption of Ordinance O-09-18 on July 13, 2009, upon the recommendation of the Plan Commission after its own hearing. Absolute legislative immunity attaches to the introduction and voting on local ordinances. *Biblia Abierta v. Banks*, 129 F.3d 899, 904 (7th Cir. 1997). "An ordinance adopted through legislative process, and having force of law, is covered by legislative immunity." *Benedix v. Vill. of Hanover Park,* 677 F.3d 317, 318 (7th Cir. 2012). Passing a zoning ordinance is a quintessential legislative function, and here it is the root of all the landlords' trouble; before the zoning changes, their tenant could have proceeded with his business plans. And, although the landlords insist that the Village was out to get them, "absolute immunity shields a legislator's conduct even when that conduct is based on improper motives." *Biblia Abierta,* 129 F.3d at 903; *Benedix*, 677 F.3d at 318 (legislative immunity applies "no matter the motives of those who proposed, voted for, or otherwise supported the proposal"). Thus it is clear that Defendant Elizabeth Asperger, the Village President and a Trustee, enjoys

absolute immunity for her role in debating and voting on the ordinance—even if the landlords are correct that she acted out of spite, revenge, or other improper motive.

The Village Manager, Robert Pilipiszyn, who is not on the Board of Trustees, and therefore did not vote on the legislation, poses a more difficult question that requires the Court to draw the finer lines described by the Seventh Circuit in *Hansen v. Bennett*, 948 F.2d 397, 404 (7th Cir. 1991). An official does not have to be a "legislator" to be shielded by legislative immunity; it is the nature of the action that is determinative. *Id.*; *see Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011). Legislative acts subject to immunity include (1) introducing, debating, and voting on legislation; (2) activities that could not give rise to liability without inquiry into the legislative acts and the motives behind them; and (3) activities essential to facilitating or preventing the core legislative process. *Biblia Abierta*, 129 F.3d at 903.

The plaintiffs' statements of material fact, both in opposition to defendants' motion and in support of their own, say very little about what allegedly unlawful actions the Village Manager took, as distinct from that of the Village Board, which passed the ordinance that caused their alleged injury. Mr. Pilipiszyn signed Grayson's business license, but that is what the plaintiffs wanted, and it has nothing to do with the later passage of the zoning ordinance that effectively revoked the license.[3] He also received "approximately 500 emails" pertaining to the

---

[3] The plaintiffs make the same argument as to Asperger, asserting that both individual defendants strayed outside the legislative function into areas of zoning enforcement by acts such as signing Grayson's business license. But the actions that allegedly injured the plaintiffs were not the those permitting the establishment of the pawn shop, such as *granting* a license to Grayson, but the actions that effectively thwarted that endeavor. The plaintiffs assert that they "have plainly established that Defendants assumed the administrative (and decidedly non-legislative) function of licensing, permitting and zoning enforcement including, but not limited to, (and importantly) revocations and denials," see Pl. Cross Motion, Doc # 81 at ¶ 2, but they identify no facts in support of that contention and so far as the evidence in the summary judgment record reflects, the only action that served "to destroy" the value of the landlords' lease with Grayson (Amended Cmplt. ¶1) was the enactment of the zoning amendment.

pawn shop and the zoning amendments and he was "aware of" the "urgent meeting" called by local businesses to discuss their opposition to the potential pawn shop. But mostly, the plaintiffs lump Mr. Pilipszyn among "all defendants" as part of a conspiracy to ruin their business arrangement with Grayson, without providing more specific facts about his individual role. On this record, and with the plaintiffs' burden to provide "specific facts" in response to defendants' motion, we conclude that Mr. Pilipiszyn's role in the zoning changes entitle him to legislative immunity, particularly under the second two types of legislative acts listed in *Biblia Abierta*: "activities that could not give rise to liability without inquiry into the legislative acts and the motives behind them" and "activities essential to facilitating or preventing the core legislative process." 129 F.3d at 903; *see also Bogan*, 523 U.S. at 55 ("Petitioner Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official."). The Court is hard-pressed to find evidence of *relevant* actions by the Village Manager unrelated to the zoning legislation. The Court therefore concludes that both of the individual defendants are immune from the federal constitutional claims.

The plaintiffs have also asserted state constitutional and common law claims against the individual defendants, however, and the federal legislative immunity *Brandhove* provided does not inevitably shield them from those state law claims. But the defendants argue (and the plaintiffs fail to dispute) that Illinois law grants municipal local public officials legislative immunity at least as broad as that granted under federal law. The Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq*., provides that "[a] public employee is not liable for an injury caused by his adoption of, or failure to adopt, an enactment, or by his failure to enforce any law." *Id.* § 2-205. This provision has been interpreted by the Illinois courts to provide absolute immunity to local public officials for injuries caused by

their participation in the legislative process, even if their conduct is deemed willful and wanton. *See Carter v. City of Elmwood*, 162 Ill. App. 3d 235, 237 (3d Dist. 1987). Moreover, an "injury" under the Act "includes any injury alleged in a civil action, whether based upon the Constitution of the United States or the Constitution of the State of Illinois, and the statutes or common law of Illinois or of the United States." *Id.* § 1-204.[4] Thus the individual defendants, under the plain language of the statute, are also immune from liability under the Illinois Constitution and Illinois common law for any injury arising out of the adoption of the zoning amendments, or for that matter, from any exercise of discretion in determining policy, *see* 745 ILCS 10/2–201, or from any act or omission in the execution or enforcement of any law, *see id.* § 2-202. Accordingly, the individual defendants are immune from the state law claims (Counts 11-12, 14-15, 17-18, 20-23) as well as the § 1983 claims (Counts 2-3, 5-6, 8-9).

The individual defendants' immunity on the state-law claims also precludes liability for the Village. Not only does the Tort Immunity Act provide immunities for the public entity that essentially mirror those of individual public officials, *see* 745 ILCS 10/2-103 – 2-108, it further provides that "a local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." *See id.* § 2-109. Because the Village cannot be liable for its agents' actions to a greater extent than the agents themselves, the state law claims against the Village (Counts 10, 13, 16, 20-23) also fall away on immunity grounds.

---

[4] Despite this broad language, by operation of the Supremacy Clause, the Tort Immunity Act does not immunize local government officials from federal constitutional claims brought under § 1983. *Thomas ex rel. Smith v. Cook Cnty Sheriff*, 401 F.Supp.2d 867, 875 (N.D. Ill. 2005) ("[T]he Illinois Tort Immunity Act does not shield the defendants from [plaintiff's] Section 1983 claims, because . . . federal laws are supreme to state laws."); *Anderson v. Vill. of Forest Park*, 238 Ill. App. 3d 83, 92 (1st Dist. 1992). However, as already discussed, the individual defendants are immune from those claims under the federal doctrine of absolute legislative immunity.

The same is not true, however, with respect to the *federal* constitutional claims against the Village. For purposes of § 1983, liability can flow to the municipality only by way of a claim pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). A *Monell* claim requires the plaintiff to plead and prove that he was injured not by the unlawful actions of a municipality's agents, but by (1) the enforcement of an express policy, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority. *Id.* at 694; *Campbell v. Miller*, 499 F.3d 711, 720 (7th Cir. 2007). Here, among the 23 counts of the Amended Complaint, there is no *Monell* claim labeled as such, even though Counts I, IV, and VII purport to allege federal constitutional violations by the Village. The Court might be within its right to order outright dismissal of the claims, but this would elevate form over function. The defendants have long been on notice that the landlords seek to hold the Village itself liable, and have defended the Village on the merits.  The pleading labels (or lack thereof) should not control in this instance. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 744 (7th Cir. 2010).

More importantly, this is a case where it is self-evident that the plaintiffs claim to be harmed by official policy; a generally applicable ordinance is nothing if not the "policy" of the municipality, enacted by those with final policy-making authority. *See Benedix*, 677 F.3d at 318 ("legislation makes the elimination of Benedix's position the Village's official policy"). Accordingly the Court addresses the claims against the Village to they extent they would be cognizable under *Monell*: that is, to the extent that the claims are clearly based on the Village's enacted policy, rather than vicarious liability for its agents' actions.

A final preliminary matter before proceeding to the merits of the landlords' constitutional claims against the Village: the Court has already determined that the Village is immune from the

state constitutional claims, but it notes that, even if that were not the case, it would not analyze those claims separately. The Amended Complaint sets forth separate claims under the constitutions of the United States and Illinois for each theory—equal protection and substantive and procedural due process—but neither side's extensive briefs articulate any difference in the applicable standards under the state and federal constitutional provisions. The Illinois Supreme Court has reaffirmed that it follows a "limited lockstep" approach to the interpretation of substantially similar provisions of the state and federal constitutions. *People v. Caballes*, 221 Ill. 2d 282, 309 (2006), and in the absence of any argument or authority that the protections of the state and federal constitutions differ in the context of these claims arising from the enactment of a zoning provision, the Court would follow the parties' examples and take up the claims collectively. *See generally Smith v. Severn*, 129 F.3d 419, 424 n.3 (7th Cir. 1997).

### C. Class-of-One Equal Protection

The equal protection clause prohibits state action that discriminates on the basis of membership in a protected class or that irrationally targets an individual for discriminatory treatment as a so-called "class of one." *Reget v. City of La Cross*, 595 F.3d 691, 695 (7th Cir. 2010). The landlords, who are not part of a protected class, proceed under the latter theory. They primarily contend that the Village "passed a zoning ordinance that specifically targeted—and retroactively affected Plaintiffs and their validly executed lease." *See* Pl. Mem. in Opposition, Doc. # 80 at 8. They further attempt to show that the Village "treated Plaintiffs differently based upon illegitimate animus," *id.*, stemming from prior disputes between the landlords (or their family members) and the Village.

The Seventh Circuit has not resolved the question of whether animus is a necessary component of a class-of-one claim, but not for lack of trying. The cross-motions for summary

judgment were filed before the Seventh Circuit issued its decision in the class-of-one case of *Del Marcelle v. Brown Cty Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc*). In that case, the judgment dismissing a purported class-of-one equal-protection claim was affirmed by a tie vote of the Court of Appeals sitting *en banc*, and the court issued three decisions. The "lead opinion" signed by four judges concluded that class-of-one discrimination occurs only when a state actor intentionally singles out the plaintiff for unfavorable treatment, with both discriminatory intent and effect, and without justification—that is, for personal reasons not grounded in the official's public duties. *See id.* at 889, 893. Chief Judge Easterbrook penned a solo concurrence, opining that motive or intent "has no role at all" in class-of-one lawsuits, *id.* at 900, and explaining why class-of-one theory should not apply under the facts of the case, *see id.* at 901-904. Finally, in the opinion garnering the most votes, the dissenters proposed a standard simply requiring a plaintiff to plead and prove that he was the victim of, and was injured by, intentional discrimination at the hands of a state actor who lacked a rational basis for singling out the plaintiff. *Id.* at 913. According to the dissenting plurality, such factors as "personal animus, illegitimate motives, inexplicable deviations from clear rules" are not elements of the claim but illustrations of the facts on which a successful plaintiff might rely to show that the discriminatory treatment was irrational. *See id.* The issuance of the three opinions makes an understatement of the court's remark that "[t]he law concerning 'class of one' equal-protection claims is in flux." *Id.* at 888.[5]

Whatever the role of animus in class-of-one claims in the Seventh Circuit in the wake of *Del Marcelle*, the plaintiff must at least show that he was arbitrarily or irrationally targeted for unfavorable treatment. *See id.* at 889, 913; *Reget*, 595 F.3d at 695. This is in harmony with the Supreme Court's explanation that class-of-one discrimination occurs if the plaintiff "has been

---

[5] Neither party submitted *Del Marcelle* as supplemental authority in support of their arguments.

intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Ultimately, though, the parties' debate about whether the defendants harbored animus against the landlords is not relevant, because the plaintiffs do not meet even this lower threshold.

In support of their equal protection claim, the plaintiffs primarily argue that "Defendants passed a zoning ordinance that *specifically targeted*—and retroactively affected Plaintiffs and their validly executed lease." Pl. Response Br. at 8 (emphasis in original). They also rely on the "manner in which [the amendments] were passed," *see* Pl. Br. in Support, Doc. # 84 at 9—which the Court interprets to include the issuance, then effective revocation of the pawn shop license, the citizen uprising, the emails to and among city officials, the expedited Plan Commission meeting, and the closed executive session of the Board of Trustees at which the zoning changes may have been a topic—as further evidence that they were singled out unfairly.

The problem with this argument is that the zoning amendment did not apply only to the plaintiffs, but equally to all property owners in the Village.  The injury they claim stems from the passage of a generally applicable zoning ordinance, not the civil equivalent of a bill of attainder applicable only to the plaintiffs. Among the property owners renting or seeking to rent commercial property, the plaintiffs were treated no differently:  the zoning amendments prevented all from renting for prohibited uses, even those that previously were permitted. The change applied to all property owners in the C-1 district going forward from its passage, unless the business was currently in possession of a license (which Grayson had) and a certificate of occupancy (which he did not). Therefore anyone wishing open a pawn shop, start a pay-day loan establishment, or sell gravestones, fireworks, or swimming pools (all of these being uses that the ordinance in question prohibited), was equally thwarted.

Perhaps recognizing the problem posed by the general application of the zoning ordinance, the plaintiffs argue that other property owners were not similarly situated because none lost a tenant after the amendment was adopted.[6] As the only property owners with an existing tenant who was adversely affected by the zoning change, the plaintiffs maintain that they were specifically and unlawfully targeted by the law. But that fact, although true as far as the evidence shows, is immaterial for purposes of the legal analysis. A zoning change that is generally applicable prospectively, but affects a single landowner at the time of passage, is not evidence of individual discrimination. *Reget*, 595 F.3d 691, 696 (7th Cir. 2010) ("Even if [plaintiff] was the only property owner…affected by the City's rezoning effort, [he] can hardly claim he was target for discriminatory treatment when 100 properties were ultimately rezoned."). Similarly, a zoning change that is adopted in response to a specific proposal does not render it discriminatory or irrational. *Flying J*, 549 F.3d at 547; *Pro-Eco, Inc. v. Board of Com'rs of Jay Cnty*, 57 F.3d 505, 515 (7th Cir. 1995) (rejecting argument that "ordinance was unfair because [plaintiff] was apparently the only company with its eyes on developing a landfill…at the time the Board acted"). In other words, "legislatures may enact generally applicable legislation as a prophylactic to the danger posed by one particular actor as long as the end of the legislation is legitimate and, assuming the legislation does not distinguish between classes on bases susceptible to intermediate or strict scrutiny, the means are rationally related to the end." *Pro-Eco, Inc.,* 57 F.3d at 515.

---

[6] The plaintiffs compare themselves to "property owners seeking to rent to any tenant that would use the property in a manner permitted by existing code," (Pl. Response Br., Doc. # 80 at 9). This formulation highlights that Plaintiffs' complaint is discriminatory enactment, not enforcement, of the zoning changes (that is, they do not complain that other landlords are being allowed to rent to pawn shops after the ordinance), a fact that further reinforces the Court's conclusion that the individual defendants are immune because this suit is predicated upon legislative, rather than executive, acts.

As the only landlords with an existing lease affected by the zoning changes,[7] the plaintiffs have shown that the zoning change had an adverse impact on them, a necessary component of standing and injury, but insufficient to demonstrate that the Village specifically targeted them for unfavorable treatment. But even were the Court to conclude that the plaintiffs have sufficient uncontested evidence to establish that the Village (recall that the individual defendants are immune) enacted the zoning amendment, with or without animus, for the purpose of specifically targeting the plaintiffs, their equal protection claim would still fail because the plaintiffs have fallen woefully short of establishing that the zoning amendment was irrational.

Legislation fails rational-basis scrutiny only "if no sound reason for the action can be hypothesized," or it is "wholly impossible to relate to legitimate governmental objectives." *See Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). Moreover, the landlords must overcome the presumption that the legislation is rational. *See Flying J*, 549 F.3d at 545. It is not difficult to hypothesize a rational basis for banning pawn shops in a downtown shopping area. One is obvious from the evidence submitted by both the landlords and the Village: a number of local business owners and residents were opposed to a pawn shop opening up in the C-1 shopping district based on a variety of concerns relating to the perception and character of the area. There is no reason that local politicians cannot respond to constituents' concerns, provided of course that the concerns do not entail discrimination against a suspect class or some other improper purpose. *See Roberts v. Vill. of Shorewood*, No. 00 C 6854, 2002 WL 1331999, at *6 (N.D. Ill. June 17, 2002) (explaining that basing decision to restrict in-home daycare facilities on residents' opposition was not irrational, even if residents' fears about traffic and property values were unfounded). The Village posits other rational bases, including: (1) pawn shops do not generate

---

[7] Here we view the facts in the light most favorable to the landlords, despite the defendants' argument that the lease was not in effect.

retail sales tax revenue; (2) pawning activities, such as accepting goods of uncertain origin and issuing short-term collateralized loans, could attract crime; (3) the local police department could be burdened by reporting requirements imposed on pawn shops by state law; (4) prohibiting pawn shops downtown would advance certain goals in the Village's 2005 Comprehensive Plan.

The plaintiffs call these reasons nothing more than "elitist attitudes and unsupported theories" about pawn shops. But the bar is low for rational basis review, and the landlords are far off base in suggesting that the Village had to provide scientific or statistical evidence to support their reasons. *Smith v. City of Chicago*, 457 F.3d 643 (7th Cir. 2006) ("The absence of an explanation, or even an incomplete, inadequate, or inaccurate explanation will not equate to a lack of rational basis."). The Village needs only to hypothesize a rational basis, not prove it. The plaintiffs further protest that the Village's aims are not tailored closely enough to its goals. For example, they argue that banks, like pawn shops, give loans, and are susceptible to robberies (they point to nationwide statistics but do not suggest that La Grange is hotbed of bank robberies). They say, too, that antique stores, like pawn shops, engage in the resale of used goods. Again they miss the point: A local ordinance aimed at remedying a problem need not entirely eliminate the problem; instead, "reform may take one step at a time." *Vaden v. Vill. of Maywood*, 809 F.2d 361, 365 (7th Cir. 1987) (citing *Williamson County*, 348 U.S. at 489; *Bowen v. Owens*, 476 U.S. 340 (1986)).

And because the landlords cannot make the baseline showing that they were singled out for unfavorable treatment compared to others similarly situated, without a rational basis, they cannot save their claim by proving illegitimate animus. "[A] given action can have a rational basis and be a perfectly logical action even if there are facts casting it as one taken out of animosity." *Flying J*, 549 F.3d at 547. In any event, despite criticizing the defendants for not

"focusing on the acrimonious history between the parties," (see Pl. Br. in Opp., Doc. # 80 at 11), The plaintiffs do not develop the arguments about animus. Instead, they simply cite to broad swaths of their Rule 56.1 statement discussing past incidents (a grass-cutting bill, a ticket issued to the Brannens' mother related to the purported use of her property as a church, and a failed real estate deal between the landlords and the Village a decade ago), which show only that the landlord companies' principals (John and Larry Brannen) or their family members have clashed before with the Village. The plaintiffs fail to connect the dots such that a jury could reasonably conclude that the Village adopted the zoning changes as a result of these past events. With the possible exception of the sequence of events, there is no evidence of any connection at all (which is not to endorse the fallacy of *post hoc ergo propter hoc*). The only conclusion supported by the record is that, once presented with a concrete proposal, the Village acted to prevent any pawn shop from opening, regardless of who owned the building in which it would be housed—making the animus, if any, irrelevant. This is stark contrast to *Cruz v. Town of Cicero*, 275 F.3d 579 (7th Cir. 2001), a case on which the landlords rely heavily.

In *Cruz*, a jury found that the municipality imposed unprecedented, and extralegal, requirements on one set of condominium developers while other developers were made to comply only with the simple rules established in the local ordinances. *Id.* at 589. The reason for the difference in treatment was illegitimate animus stemming from the plaintiff developers' failure to financially reward the local official (or her campaign) for the "million dollar favor" of approving a lucrative lease in an earlier transaction. *Id.* The equal protection violation occurred because the official unequally applied the laws to similarly situated developers. *Id.* at 588.

Not so in LaGrange. There, no landlord may lease property for prohibited uses, including pawn shops. The plaintiffs have not shown that the Village singled them out among similarly

situated property owners for unfavorable treatment, whether motivated by animus or not. The class-of-one equal protection claims (federal and state) therefore fail.

### D. Substantive Due Process

The parties' arguments about substantive due process largely mirror those made with respect to the class-of-one equal-protection claim—unsurprisingly, as both types of claims address arbitrary action by state actors. Substantive due process protects against government power arbitrarily and oppressively exercised, either through legislative or executive action. *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). But it is "a modest limitation that prohibits government action only when it is random and irrational." *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1001 (7th Cir. 2008). It does not "confer on federal courts a license to act as zoning boards of appeals." *Id.* at 1000. Having already concluded that the plaintiffs have failed to establish that LaGrange's exclusion of pawn shops from its prime commercial district was irrational, the Court denies their substantive due process claim on the same basis.

Even if the plaintiffs could establish that the LaGrange zoning amendment was irrational, its substantive due process claim would fail in any event because there are several threshold prerequisites to advancing such a claim that the plaintiffs have also failed to establish.[8]

Before a Court will consider if arbitrary or irrational interference with property occurred, the plaintiffs are required to "first establish either an independent constitutional violation or the inadequacy of state remedies to redress the deprivation." *Id.* at 1001. Here, the defendants argue that the landlords are required to do both and have done neither. They are only half right: the threshold requirements are alternative, not cumulative, but plaintiffs have satisfied neither.

---

[8] Standing to assert the claim, however, is not one of them. For the reasons discussed in connection with the plaintiffs' procedural due process claim, below, the Court concludes that the plaintiffs do have standing to assert their due process claims.

Taking the easy question first, the Court agrees that, without proving their equal protection claim, the plaintiffs have not established an independent constitutional violation. *See LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 943 (7th Cir. 2010) ("In light of our conclusion that LaBella failed to state a class-of-one claim, it has no independent constitutional violation on which to base its substantive due process claim").

The defendants further argue that the landlords fail to prove that state-law remedies were inadequate to redress the harm caused by the zoning change. For their part, the plaintiffs insist that this requirement, which derives from *Parratt v. Taylor*, 451 U.S. 527, 535-44 (1981) and its progeny, does not apply to them. *Parratt* held that to avoid turning § 1983 into a tort-law system duplicative of those already provided by the States, a plaintiff cannot invoke the due-process clause where state laws provide an adequate remedy for the complained-of conduct. *See id.*

The plaintiffs, citing *Wilson v. Civil Town of Clayton*, 839 F.2d 375 (7th Cir. 1988), insist that the *Parrat* doctrine does not apply here because they are alleging an injury not based on a "random and unauthorized act" of a state actor (as occurred in *Parrat*, and which presents the danger of making every negligent act of a state employee actionable under § 1983), but on an "official policy" (*i.e.*, a *Monell* claim). *See* Pl. Mem. in Opp., Doc. #80 at 16. *Wilson* indeed draws this distinction and states that "a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite." *Id.* at 381. The defendants demean the plaintiffs' argument as "baffling" and "irrelevant," without further explaining their own argument that the *Parratt* doctrine should apply to a claim that attacks an official policy under substantive due process even though such a claim would not appear to pose the same risk of transforming §1983 into a general purpose negligence statute.

The answer lies in the type of interest being asserted. Since *Wilson* (a procedural due process case), the Seventh Circuit has held that *Parratt* (also a procedural due-process case) applies to substantive due process claims premised on deprivations of state-created property interests (but not claims invoking constitutional theories other than due process). *See McCullah v. Gadert*, 344 F.3d 655, 660 (7th Cir. 2003). "In order to not eviscerate the holding of *Parratt*, we have held that '[w]hen a plaintiff brings a substantive due process claim predicated on the deprivation of a state-created property interest, she must show that the state violated some other substantive constitutional right or that state law remedies are inadequate.'" *Snyder v. Nolen*, 380 F.3d 279, 298 n.2 (7th Cir. 2004). The additional requirements are sound because "the substantive right 'comes not from the Constitution, but from state law.'" *Id.* (citations omitted). And in multiple substantive-due-process cases claiming an injury to property, not to liberty or a fundamental right, the Seventh Circuit has applied the requirement that the plaintiff establish either an independent constitutional violation or the inadequacy of state remedies. *E.g., LaBella Winnetka, Inc.,* 628 F.3d at 943; *Gen. Auto Serv. Station,* 526 F.3d 991 at 1001; *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003); *Gable v. City of Chicago*, 296 F.3d 531, 541 (7th Cir. 2002). This has been true of property-based intrusions irrespective of whether the challenged action was "random and unauthorized" or "official policy."

The asserted constitutional interest at stake in this case is unquestionably a state-created property interest—the landlords' lease for the continued use of their property for a once-permissible purpose. They halfheartedly claim also to have a "foundation [*sic*] liberty interest" but they fail to define it and the plaintiffs "all are corporations," which "do not have liberty interests, period." *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th

Cir. 1995).[9] This is about the landlords' property, not their liberty. Thus (having failed to prove an independent constitutional violation) they must show that state law fails to provide adequate remedies for their harm.

The plaintiffs, making virtually no argument on this point, have failed to do so. Moreover, the record shows that the landlords never sought a variance or other zoning relief from the Village or took action to have the pawn shop declared a legal nonconforming use. Nor was there any state-court lawsuit filed pursuant to Illinois' well-established procedure for zoning challenges based on the standards culled from *La Salle Nat'l Bank of Chicago v. Cnty of Cook*, 12 Ill. 2d 40, 46, (1957) and *Sinclair Pipe Line Co. v. Vill. of Richton Park*, 19 Ill. 2d 370, 378, (1960). *See, e.g., Napleton v. Vill. of Hinsdale*, 374 Ill. App. 3d 1098 (2d Dist. 2007). A mandamus action was another option, although in itself it would not have made the landlords whole for the huge sums they claim to have lost while they could not let their property.

The plaintiffs' substantive due process claim, then, fails at every turn. The claim is not founded upon an independent constitutional violation; the plaintiffs have not exhausted their available administrative remedies; and the Village's action was not irrational. Accordingly, the Court dismisses both the federal and state substantive due process claims.

### E. Procedural Due Process

Procedural due-process claims involve a two-step approach: first the Court asks whether the plaintiff has been deprived of a protectable liberty or property interest, and, if so, whether the deprivation occurred without due process of law. *Pro Sports Bar & Grill*, 589 F.3d at 870. As to the first step, the defendants insist that the landlords are improperly attempting to vindicate the

---

[9] In any event, the Court sees nothing of the very circumscribed set of "fundamental rights" at stake here. *See Albright v. Oliver*, 510 U.S. 266, 272 (U.S. 1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.")

property rights of someone else—their tenant whose business license was effectively revoked by the passage of the zoning amendments. Although there is precedent holding that a business license is property, the plaintiffs had no business license, and they do not help their case by focusing so much of their argument on Grayson's license. However, it would be a stingy reading of the plaintiffs' arguments to limit their proclaimed interest only to the *de fact*o revocation of their tenant's business license. The landlords had an executed lease with a tenant for purposes of opening a pawn shop (or "related" establishment), and that use was permitted at the time of the lease. It is an open question whether governmental interference with a private contract can be give rise to a due-process claim. *E.g., Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004) (suggesting that a state actor interfering with a land sale contract could violate procedural due process). But the plaintiffs' complaint goes deeper than the private lease, as the landlords' own right to continue a permissible use of their property was affected. *See Gen. Auto Serv. Station*, 526 F.3d at 1000 ("Illinois case law recognizes that a property owner can acquire a property interest in continuing a land use that was lawful when commenced and rendered unlawful only by a subsequent legislative enactment."). The Court therefore concludes that the landlords do have standing to assert their due process claims.

But even so, the plaintiffs fail to show that the procedures pursuant to which the zoning changes were implemented were constitutionally inadequate. In fact, the landlords never come out and say what "process" they believe they were owed but failed to receive. Perhaps this is because, as a general rule, "[w]hen zoning decisions are confided to a legislative rather than a judicial body . . . the affected persons have no right to notice and an opportunity for a hearing: no right, in other words, to procedural due process." *Indiana Land Co*., 378 F.3d at 710 (collecting cases). "Governing bodies may enact generally applicable laws, that is, they may legislate,

without affording affected parties so much as notice and an opportunity to be heard." *Pro-Eco, Inc. v. Bd. of Com'rs of Jay Cnty.*, 57 F.3d 505, 513 (7th Cir. 1995). At any rate, though, the record shows that the ordinance was enacted in accordance with normal procedures: notice and a public hearing before the Plan Commission (albeit, a hastily scheduled one) preceding its recommendation to the Board, and then notice and a (regularly scheduled) public meeting before the Village Board before adoption of the changes. *See Indiana Land Co*., 378 F.3d at 710-711 (no deprivation of procedural due process where plaintiff has "ample notice" and two hearings before zoning decision).

The plaintiffs' chief complaint about these meetings is that they were "sham" proceedings with a foregone conclusion. What they lack is evidence. Only Michael LaPidus, and other private individuals, are shown to have opposed the pawn shop from inception. Indeed, the Village initially granted Grayson's business license, which belies the claim that the Village was prejudiced against the pawn shop from the outset. There was a targeted lobbying effort to prevent the pawn shop from opening; and various public officials had concerns, too. But there is no evidence that the officials who made the ultimate decision on the zoning changes did not hold the public meetings and subsequent votes in good faith. The numerous emails to and among Village officials about the pawn shop are of great concern to the plaintiffs, but they ultimately fail to show that the correspondence proves a "sham" rather than an ongoing dialogue.[10]

The plaintiffs—along with everyone else subject to the zoning ordinance in La Grange— received all the legislative process they were due. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 767-68 (7th Cir. 2003); *River Park v. City of Highland Park*, 23 F.3d

---

[10] The plaintiffs' undeveloped argument that certain actions of the Trustees violated the Open Meetings Act in unspecified ways also fails. Regardless, "a unit of state or local government does not violate the Due Process Clause just because it violates a state or local law." *Taake v. Cnty of Monroe*, 530 F.3d 538, 541 (7th Cir. 2008).

164, 165-167 (7th Cir. 1994). And they have never argued that they were owed but denied compensation from the interference with their property (a fact that further buttresses the Court's view, above, that this is not a regulatory takings case that would trigger *Williamson*'s ripeness requirement). Thus, the plaintiffs' procedural due process claims fails.

### F.    State Law Claims

The Court has already determined that the individual defendants and the Village are immune from liability from injuries caused by the enactment and enforcement of the zoning amendments. Judgment for the defendants therefore is proper on the claims of interference with vested rights (Counts 19-21), conspiracy (Count 22), and tortious interference with contract (Count 23). The Court notes, however, that the claims would have failed on the merits, too, due to the dearth of admissible evidence the plaintiffs have marshaled to support them.

First, the Court can find no Illinois authority in which the "substantial" change in position underlying a vested rights claim was merely executing a property lease. The landlords did nothing but sign a lease that was rendered worthless almost immediately, not after they made major investments or otherwise acted in reliance on its existence (at least not as far as plaintiffs have shown). *See 1350 Lake Shore Assocs*. v. *Randall*, 401 Ill. App. 3d 96, 103-04 (1st Dist. 2010). Moreover, the zoning amendment impaired the value of the lease because the landlords required the term that the tenant use the space for a pawn shop and its related activities, not some other enterprise.

For similar reasons, the tortious interference claim is not established on these facts. *See Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434, 444 (1st Dist. 2011) (elements of claim are "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified

inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages"). The plaintiffs have presented no evidence that the Village induced Grayson to breach the lease. Although they set accurately set forth the elements of the claim, they never again refer to any "breach." Instead, the core of the plaintiffs' case, a point that they repeatedly emphasize, is that the Village defendants "invalidated" the lease with the zoning amendment (Pl. Mot., Doc. # 81 ¶ 7; Pl. Mem. in Support, Doc. #84 at 21) or "revoked Plaintiffs' right to lease the Property" (Pl. Response in Opp., Doc. # 80 at 3).[11] That, however, is a different claim than inducing a breach (and one undoubtedly encompassed by the other 22 counts of the Complaint). The plaintiffs' Statement of Material Facts (Doc. #82) and their other evidentiary submissions do not establish any breach of contract by Grayson. Thus a jury could not reasonably conclude that Grayson breached the lease, let alone at the Village's behest, and the plaintiffs cannot establish the third and fourth elements of a claim for tortious interference with a contractual relationship.

Finally, the loosely defined civil conspiracy claim fails. A civil conspiracy involves "an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglass Corp.*, 188 Ill.2d 102, 133 (1999). The landlords failed to adduce evidence of concerted action between the named defendants or of any wrongful acts committed. At any rate, if the underlying constitutional or tort claims fail (the plaintiffs do not specify on which they base their conspiracy charge), then so must the conspiracy count based on the same conduct. *See Illinois Traffic Court Driver Imp. Educ. Found. v. Peoria Journal Star, Inc.*, 144 Ill. App. 3d

---

[11] Elsewhere the plaintiffs state that even after the zoning ordinance was passed, they "considered their lease to Mr. Grayson to remain in full force and effect." Pl. Response to Def. Statement of Add'l Material Facts, Doc. #102 ¶ 38 & Answer. This statement, while confusingly incongruous with the plaintiffs' theory that their lease was "revoked" or "invalidated," further undermines the claim that Grayson "breached" his lease.

555, 562 (3d Dist. 1986) ("[T]here is no cause of action for conspiracy unless something is done, which, without the conspiracy, would give rise to a claim for relief.").

For these reasons, in addition to the successful immunity defenses, judgment for the defendants is appropriate on all of the state common-law claims. As for the state constitutional claims, the Court reiterates that its analysis of their merits is the same as its analysis of the § 1983 claims, and therefore, judgment for the defendants on the merits would also be proper.

## CONCLUSION

For the reasons above, the Court grants the defendants' motion for summary judgment and denies the plaintiffs' cross-motion. Judgment will be entered for the defendants on all claims in the Amended Complaint. Finally, as stated above, the parties' cross-motions to strike are denied.

Date: July 17, 2012

Honorable John J. Tharp, Jr.
U.S. District Judge